We'll now move to the second case on our calendar, that's Cangemi v. United States. Let me make sure counsel is here. Mr. Hill? I think you're on mute. Yes, Your Honor. Okay. And we have two lawyers for the appellees. Mr. LaPari? Mr. LaPari there? Mr. LaPari, I think you're on mute. Good morning, Your Honor. Excuse me. Okay. Good. And Mr. Stern? Good morning, Your Honor. Okay, Mr. Stern. Good morning to you. All right. So, Mr. Hill, we gave you 12 minutes each, but Mr. Hill has reserved two minutes for rebuttal, so that's 10 minutes out of the gate. You can proceed. Thank you, Your Honor. May it please the Court. This case arises out of a devastating condition that exists in a community out in Montauk, Long Island, where a substantial property has simply eviscerated, public and private, and is a direct result of the existence of the town-owned jetties that opened the harbor to Lake Montauk. I will drill down quickly to the issue that is really on point here, but just in broad strokes, while this case involved technical issues and expert testimony from coastal geologists, there's really no dispute and it's self-evident about what happened in terms of the phenomenon on the ground. And that's apparent in any of the aerial photos that are in the record, including the one that is at 5735 of the appendix. With that said, this case progressed through discovery, motions to dismiss, summary judgment motion, went to trial. Through that course of motion practice, the issues were narrowed. It went to trial as against the town. I think we know the procedural history here. I think you're better off getting to the arguments. Okay, so after the jury returned in favor of the plaintiffs, the district court vacated that principally upon the issue in the state law nuisance claim in the intent element of that claim. And it did so in a way that was completely contradictory to two prior rulings that articulated how that intent element would be understood and the specific evidence that would establish that element. The decision vacating the jury's verdict does not in any way identify or refer to some insufficiency of the evidence that was presented to the jury. Well, as I understood it, the district court concluded as a matter of law that the town did not have the ability to control the jetties, having ceded that to the Corps of Engineers. Wasn't that the basis for its conclusion that intent could not have been found by the jury? That is right. Now tell us why that was error. That was error because there are multiple ways that intent can be established. Well, multiple ways. Why don't you start with how they could have controlled the power of the jetties or mitigated it or whatever your theory is that would have created a question on that point. As is often the case in nuisance theories, it's the failure to act and the failure to abate the nuisance that gives rise to the liability. That's what you're saying. They failed to act. But what could they have done? What should they have done? The ability to control the jetties, because the word control seemed to gain a lot of power in the late stage of this decision making, clearly does not mean the ability to move the rocks around that form the jetties. But they're not allowed to touch the jetties, right? They're not allowed to touch them. But this case never concerned any request or desire to in any way remove or modify or do anything physically to the jetties. The fact is that the jetties perform an intended function, which is to stop the flow of sand, because that's what keeps the channel open. But in doing so, it also starves the western shoreline. So in those cases, the remedy is right there in front of us. The sand that accumulates on the east side of the jetty is on town property. I'm sorry, can I just interrupt? You're talking about remedies. Do you agree that control is a factor in nuisance law or do you not agree with that? I don't agree that it must be. I think in this case, I think the evidence both... No, no, no. Don't talk about... I'm sorry. I want to be clear. I'm talking as legal rules. I'm not interested right for the moment, at least in the facts of the case. My question is, do you agree or not that control over the nuisance itself is an element to show someone's responsible for nuisance? Or are you making a different argument that says control over furnishing a remedy is adequate? So in other words, even though they can't control the creation of the nuisance, are you trying to argue that the fact that they could control the remedy, meaning they could have carted boatloads of sand, is adequate? Yes, that's correct. The ability to abate a nuisance, particularly when there's knowledge of the effects of the nuisance and there's the capacity to do something about it, the failure to mitigate is conduct. Okay, so you're saying that an element of a nuisance claim is control over the effects of the nuisance, right? Am I articulating your argument correctly? Yes. Controlling the effects when you have the ability to do it and you have knowledge that it's occurring and you unreasonably fail to do it establishes that element. So could you just give me your best case for that proposition, your ability to control an abatement of the nuisance, meaning you see the ill effects it's having and you can cart sand around. What is your best case for that proposition? As distinct from you have the ability to actually abate the nuisance, which is the jetty that's blocking the sand. What is your best case for that proposition? Well, I think it's most clearly articulated in any number of the restatement positions. Yeah, give me your best case. The State of New York v. Shore Realty, which comes out of this court, indicates that a landowner is subject to liability for abatement. For either public or private nuisance on its property upon learning of the nuisance and having a reasonable opportunity to abate it. Does that stand for the proposition that when we say abating the nuisance means actually stopping the nuisance from happening in the first place or just providing a remedy afterwards for what the ill effects are? I think they're one and the same. The ability to mitigate... I guess that's what I'm trying to probe down is, do you have a case that says that those two principles are in fact identical? That an ability to mitigate the consequences of the nuisance are the same as stopping the nuisance in the first place? I mean, I could abate your nuisance, right? I have nothing to do with you, and I could cart wheelbarrows full of sand over there and fill up the beaches, but that doesn't mean that I have a responsibility to. I'm just trying to think, what's the difference there? Right, but here the town authorized and is retaining the benefit of the mechanism that's causing the nuisance, and they're also literally hosting it, and the byproduct of that nuisance is deposited on their property. They have the ability to control that, and they have the ability to... To mitigate the effects of it, right? That's right. And that's what I'm asking you is, what's your best source of law equating those two principles? I believe that the short realty stands for that proposition. The Higgins v. Orchard Park case also deals with a mitigation effort as evidence of the failure to act. But let me ask you this. I mean, I understand that before the Corps of Engineers appeared on the scene, this was the town's. It basically ceded all authority to the Corps of Engineers and gave them carte blanche to decide how to maintain and use the jetties. You're saying that you nevertheless have a responsibility when the party you cede that authority to, when you give them that authority, and they use it in a way that creates this problem for the landowners, that the town still has the responsibility to mitigate or abate? Yes, it's joint and separate. I'm not sure that the cases you cited involve such a complete ceding of authority, or did I overlook something? No, but I don't think factually here there was a complete ceding of authority. Well, because it suggests that but for the immunity that the United States has, your relief would be against the party that's causing the nuisance, not against the party that isn't abating it. But you can't sue the United States if the court is right about that. And so now you're trying to sue the town, and I'm just trying to understand how, where the Corps of Engineers has complete authority over these jetties, you can sue the town. Well, the Corps has limited authority. They have a discrete purpose. The easement that the town very strenuously petitioned the federal government to undertake the federal takeover of the jetties was for the sole purpose and the limited purpose of having a navigable channel. And the easement, the document that conveys the easement rights to the Army Corps has all sorts of reservations of rights to the town to continue to use, be responsible for that property to the extent not interfering with the federal government's responsibility to maintain a navigable channel. So nothing, none of the mitigation possibilities that are available to the town in any way interfere with the Army Corps' navigational responsibility. In fact, the town's failure to distribute that sand is what causes the shoaling in the channel because it is so excessively accreted that that sand has built up and goes over and into the channel. But the point is that very clearly in the easement document, there is reserved rights that leave the town free to use and enjoy that property as far as it can so long as it does not interfere with navigation. And nothing about the mitigation potential that exists for a bypass or some other remedy would be in conflict with those navigational responsibilities of the Army Corps. I think you're over time, but I did want to hear if you had anything to say with respect to the United States as a defendant. Right? I mean, you're also challenging that dismissal. If I can just pause one more moment before moving to the United States. What appeared to be a critical pivot for the district court was its reliance on this court's decision in Sutera, which was a premises liability slip-and-fall case that dealt with the relative responsibilities of a dominant and servient easement holder. And for the reasons that are in the brief, I submit that that was a complete misapplication of this court's directives as to how to treat those situations as it relates to a third party. For one thing, that concerns a third party coming onto the easement area, but it clearly says that you look to the easement, the circumstances of the grant, to determine who would be responsible. And it specifically, Judge Raggi, to one of your earlier questions, goes to the point that both the dominant and servient owner can be jointly responsible depending on the circumstances. And I believe that this circumstance is here, where the town effectively commissioned the Army Corps to undertake this project and retained its own rights to use the land and provide a remedy, would be an instance where both have responsibilities. With respect to the Army Corps or the United States, briefly, I would just submit that the exception to the waiver of sovereign immunity under the Federal Tort Claims Act here was correctly identified by the district court in its, again, in its initial rulings that found that both the feasibility study cost-sharing agreement, as well as the Army Corps' internal regulations and its three-by-three-by-three paradigm, created mandatory obligations that the Army Corps conduct the feasibility study that had its roots in 1991, that was formally begun in 2003, and is still not complete. The record is replete with admissions by the Army Corps of its utter failure to move this project along. All the while, the properties are receding and receding. Houses are at risk of falling into the ocean. And there was an utter lack of compliance with the Army Corps' own regulations, as well as the requirement under the cost-sharing agreement. Can I just ask you, I thought it was grandfathered in. I thought this was grandfathered in. I didn't see any dispute in the record that the scoping meeting happened in September of 2006. And the regs say, the new three-by-three-by-three rule said that they only applied if the scoping meeting hadn't already happened, right? Right, but there's something counterintuitive there. The term grandfather came through a testimony of Mr. Sciorra, and there was a, what I would submit as a self-serving affidavit that... Was the self-serving affidavit contradicted by other evidence? Well, I think that by the spirit of the three-by-three-by paradigm itself, what they're saying is, because the study had already reached a certain milestone... But hang on a second, I wasn't aware that regulations had spirits. I thought they just have words, right? And if the rules say it doesn't apply based on certain dates, are you suggesting that even though by its terms it's not covered, the spirit behind the regs would supersede the words of the regs? I'm saying that it can't be read to mean that by achieving some interim... That there is then no... Why can't it be read that way? Because... Because you don't want it to be read that way, or because there's a text that suggests it cannot be read that way? I mean, I just, you're looking for something concrete, because I thought it was very clear, and hyper-technical perhaps. But it seems like it was saying that if the scoping happened before a certain date, these new rules did not apply. Is there some language that contradicts that reading? I think in the same document, there's the provision of the WRDA, which provided a four-year term for these projects to be completed. And that was from 2007, which gets you to the end of 2011 as the cutoff date. So I think that if you look at that as the rationale for why the so-called grandfathering was accommodated, and even as the district court itself did, it calculated the requirement from a date going forward. And according to the district court's own calculation, that three-by-three paradigm would have been violated two weeks after the decision was issued. All right. We've gone way over, but you've reserved a couple of minutes for rebuttal. We'll now hear... Mr. LaPari, are you going first? Yes, Your Honor. All right. You've got four minutes, and then the remaining eight are with Mr. Stern. You may proceed. Good morning, Your Honors. My name is Vincent LaPari. I'm an assistant U.S. attorney in the Eastern District of New York, and I represent AFLI, United States, which is the only party on the FTCA claims at issue. Your Honor, when this case originally started, the landowners asserted various FTCA claims alleging negligence, nuisance, and various other things. When we moved to dismiss those claims under discretionary function exception after the close of discovery, for the first time we were presented with a claim that had never arisen, was not in the administrative claims, and was not in the complaint, that the actual violation was not any negligence or nuisance, but that the court did not timely complete a feasibility study. Now, a feasibility study is something that the court does for Congress when Congress requests advice on whether a project should be undertaken. The court has no duty to recommend or not recommend the project, and Congress has no obligation to fund or not fund the Congress. Frankly, Your Honor, we argue that a claim on a feasibility study is just not something that can be presented in court under separation of power principles. That's a matter for Congress. If Congress doesn't get what they want, they're certainly free to make their own arrangements. Nonetheless, Judge Steibert addressed that claim and correctly held that it was barred by the discretionary function exception. Now, the discretionary function exception applies unless there's a mandatory duty, which leaves no choice, and unless the decision is not grounded in public policy. The easier one is the public policy inherent in the court's involvement in the Montauk jetties, 80 years of involvement, way before there were any homes even on the west side of the jetties. Were it not for the court's rehabilitation of the jetties, there would be no Montauk Harbor, there would be no multi-million dollar fishing fleet, there would be no recreational benefits, there would not be a Coast Guard station, a port of safety, and various other things. So the question becomes, did the court, assuming that there is a claim, have a mandatory duty to complete a feasibility study under the three by three, or the feasibility cost sharing agreement, the FICSA for short. Judge Steibert properly found that there was no duty under either item mentioned by plaintiff. The FICSA is very easy. It has a termination provision, and the termination provision is activated on 30 days written notice with no requirement of any reason being given. So while the FICSA says that a feasibility study will be completed, there's no requirement once the agreement is terminated, which can be done at any time. Plaintiff's argument was that the termination provision has to be read separately than the provision which imposes the duty to complete a feasibility study, and that violates black leather law. Provisions in a contract have to be read together. The termination provision terminates everything. Now under the three by three paradigm, initially when this case started with administrative claims in 2011, there was no three by three paradigm. So administrative claims couldn't have exhausted a claim on a paradigm that didn't exist for a year, and that was a basis of Judge Steibert's ruling, which plaintiffs have yet to address, and they do not address it here. They fail to exhaust any administrative remedies under a claim under the three by three paradigm. But if we turn to the three by three paradigm, it exempts feasibility studies where a feasibility scoping meeting was completed before December 2011. Here the undisputed evidence is that it was completed, the feasibility scoping meeting, in December 2006. There is absolutely no contrary evidence. Plaintiff attempts to say that this is a self-serving declaration alone that supports this claim and it should be disregarded. But before the declaration was submitted, plaintiffs had an opportunity to question Anthony Sciorra, who was the head of the project. And that was at a time when there was no claim under the three by three paradigm. And Anthony Sciorra, in his deposition testimony before we even knew there was such a claim, said we had been grandfathered, that a feasibility scoping meeting had been reached in 2006 and thus we were exempt. And there were two pieces of evidence in the record, written documents before Mr. Sciorra's deposition, which confirmed that. They referred to the three by three as grandfathered, and they referred to it as having been reached. So there is no mandatory duty by the clear written terms of the feasibility of the three by three paradigm or the cost sharing agreement. And the public policy inherent in every step that the court has taken can't be disputed. All right, let me ask you to pause there and let me see if there's any questions from the panel. No, thank you. Thank you, your honors. Thank you, Mr. LaPari. We'll now hear from Mr. Stern for eight minutes. You're on mute. Yeah, there you go. Thank you, your honor, Stephen Stern for the town of East Hampton. May it please the court. I want to make clear here, the town did not build these jetties, it didn't construct them, it doesn't maintain them, it doesn't repair them. The town didn't, as Mr. Hill said, effectively commission these jetties. After Congress directed a survey of the area to determine whether it was appropriate for control of the inlet, the Army made a strong favorable recommendation to Congress based on national security, safety, industry, benefits to the community overall. I think we were more interested in your legal argument than the facts. But in fact, the initial recommendation was no. And you went back to Congress and it was reconsidered. And then you got a recommendation of yes. I mean, that that's what the record shows. Right, because as I just want you to understand, we do recognize what the what the record shows here. I want to encourage you to get to your legal argument. Okay, well, the plaintiffs misconstrue what intent is here. There's three different ways you can show it intent, really only two in the copart case and two ways that really weren't even dealt with a trial that the judge had that Judge Seibert had addressed in summary judgment. But the third way that they focused on was this concept of being aware one's conduct is causing substantial interference and still continuing to engage in that conduct. And the town wasn't doing anything here. I think your honors understood that based on the questions that you were asking of Mr. Hill. Jetties are in conduct, the town isn't operating them. And this idea that that there's some reservation to the town to be able to do something at the inlet in terms of controlling the jetties is really plaintiff's argument that a remedy should be provided without actually the town having any responsibility here. Well, but for your having ceded the easement and it's all its terms to the Corps of Engineers, would it be the town's responsibility to deal with the consequences of the jetty for these this? Well, the town wouldn't have taken ownership of it. You know, the historical documents show that the that that Congress would all was all only reconsidered its opinion on the takeover of the inlet, if all of the structures would be ceded to the United States. And in order to do that, as a pass through, the town took technical ownership, but never had any control over these jetties. It was it was essentially a pass through. That's what the historical documents reflect. So you know, this was an this was a federal net. Before 1945, it was an assumption of control. And then it became a federal navigation project that the town wasn't even, you know, was never permitted to, to touch and never did touch. No indication that the town had notice of this nuisance at the time of the transfer, right? Absolutely not. There's no indication. There's no indication in the record that anyone was aware that jetties could cause down drift erosion. There was no developed properties on the western shoreline at the time. I mean, this all happened. You know, the jetties were built in 1926 by Carl Fisher. And we're talking the late 1930s. These properties were developed in the 1960s. Most of the plaintiffs didn't take ownership until the 90s or 2000s. So there certainly wasn't any intent to interfere with place plaintiffs use and enjoyment of the properties. And nothing at the time, no awareness of any of any conduct causing an interference anywhere close in close proximity to the time period at which the town, you know, was involved in that transfer. The plaintiff mentioned two cases at Judge, I think it was Judge Nardini's inquiry. One was the Shore Realty case. I'm going to quote from Shore Realty, which says that liability of a possessor of land is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the lands and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it. So obviously that case, I understand it was a case that the plaintiffs rely on. I don't think it's very helpful to them. The Higgins case, the other case that Mr. Hill mentioned, does them no service either. Essentially that was a case where there was a deliberate installation of a drain pipe that diverted water onto the plaintiff's properties there. So, you know, to sum it up on the issue of intent, you know, because the town had no control, no ability to control the fact that it, like anyone else, can provide a remedy. I mean, the plaintiffs, they're beachfront homeowners, they can buy sand and bring it and put it on their properties. I should mention also, in the record, these properties are about a mile down the beach. They're not, you know, immediately adjacent to the Jetties. I know Mr. Hill didn't get into the negligence claim, but that's a claim that they waived. It was the jury charge in the manner in which the jury charge was submitted to the jury in skipping the negligence portion was something that the plaintiff had actually proposed and the court granted their request to do it that way. In terms of law of the case, the court has the discretion to change its rulings, but it actually didn't change any rulings here. And I think the court absolutely got it right and made a legal determination during the trial that in its prior rulings, while the court, and obviously we wish that the court had made the rulings earlier, and we didn't have to go through a trial on this, but it made a legal determination, a trial that was appropriate and based on the facts and didn't conflict with any prior ruling of the court. Another thing I want to mention, and it's another basis for an affirmance, is that this is essentially a preemption situation where in order to find a nuisance here, that would effectively undermine the Rivers and Harbors Act. We briefed it. I don't know if the court has any questions on that or anything else, but I know my time is running out. No, I don't think so. So hearing no questions. Oh, wait, was there a question? No. No, thank you. Thank you. We'll now hear from Mr. Hill again for two minutes of rebuttal. You're on mute. And in the original decision, the district court stated that the defendants could maintain the jetties without creating a nuisance or trespass by remedial actions, meaning that they could avoid the impacts through their own remedial actions. Then in the Judge Seibert's second decision, there's a full itemization that the plaintiffs allege that the town owns the land and the jetties, that the town retains a reversionary interest in said property, and the Army Corps maintains the jetties pursuant to the license and easement of the town. The town has also agreed to hold and save harmless the United States from claims for damages that may occur from the construction and maintenance of the improvements. Furthermore, plaintiffs allege that the town has been in frequent communication with the Army Corps regarding the jetties and the resulting conditions. Such actions constitute intentional conduct. So that evidence was presented to the jury. If it was credible, if it meant what it said, that was for the jury to decide. Well, except that when Judge Seibert explained this, she acknowledged that she had thought it would be plausible to suggest that the town can maintain the jetties without creating a nuisance. But she says then that the evidence of trial had convinced the court that the town simply could not and did not exercise control over the jetties sufficient to impose liability. Now, you can argue to us that she's wrong in that, but I'm not sure why she's not allowed to say, in light of hearing the trial evidence, that there was not sufficient control. I'm just asking about her ability to alter a ruling based on what she heard at trial and got a fuller understanding of. Well, that I would agree, that she has the liberty to do that. But in the third iteration of the same issue, in the summary judgment decision in March 2017, again, to the point of whether the ability to provide a mitigation, but the failure to do it, there was specific reference to the fact that, in fact, a program had been developed by the town's own natural resources director to implement a sand bypass plan. It contemplated doing this on an annual basis with 5,000 to 10,000 cubic yards being done a year. The natural resources director for the town said, we believe it is feasible and worthwhile to do that. In fact, a pilot program for that was presented and then quashed by the town board. But Judge Seibert said that, as an example of evidence of intent being demonstrated through the failure to act, in the summary judgment decision, Judge Seibert says, for instance, former town employee Larry Penny suggested the town could exercise its discretion in erosion control and proceed with a sand bypass project. If the jury were to credit plaintiff's summary judgment evidence, it would find that the town is liable for its actions and omissions. So these are not hypothetical discussions of what evidence might constitute the intent element. The very evidence that was articulated and presented at summary judgment and was said to be what should be presented to a jury to evaluate was presented to a jury to evaluate, and it made its determination. So Mr. Stern has said that there really wasn't any change in the rulings. Excuse me. I'm sorry. I'm sorry, I just sneezed. Bless you. But clearly there was a change in ruling because the rulings that guided and framed how the case was litigated and tried demonstrated that one mechanism for establishing was through the knowledge of the problem, the ability to provide a remedy, and the failure unreasonably to do so, and that articulation was not plucked out of midair. It's from the pattern jury instructions for private nuisance. All right. Well, I think we got our money's worth in terms of argument. We went over it every time, but it was interesting, well-argued. Thanks very much. We will reserve decision.